Rosalie HARMAN and Diane Lampert
Stadler, Plaintiffs,

v.

The CITY OF NEW YORK, The Human
Resources Administration, Child Wel-
fare Administration, Marva Hammons,
Commissioner, and Kathryn Croft, Exec-
utive Deputy Commissioner, Defendants.

No. 96 CIV. 846 (DLC).

United States District Court,
S.D. New York.

Nov. 26, 1996.

752

New York Civil Liberties Union, Jeremiah S. Gutman, Levy, Gutman, Goldberg & Kaplan, New York City, Norman Siegel, New York City, for Plaintiffs.

Paul A. Crotty, Andrew A. Jones, Corporation Counsel of the City of New York, New York City, for Defendants.

## OPINION

COTE, District Judge:

This case presents the issue of whether a policy of certain New York City agencies restricting the contacts between agency employees and the press is constitutional. The Complaint challenges under the First and Fourteenth Amendments to the Constitution a policy governing child welfare agencies, which requires that employees refer to the Media Relations Office all contacts with the media regarding agency policies and activities.

On February 5, 1996, plaintiff Rosalie Harman ("Harman"), who at that time was an employee of the Child Welfare Administration ("CWA") of the City of New York, which is an agency within the Human Resources Administration ("HRA"), initiated this action against the City, the CWA, and two individual defendants, (collectively referred to as "the City"), under 42 U.S.C. § 1983, the First and Fourteenth Amendments, Article 1, Section 8 of the New York Constitution, the Due Process Clause of the Fifth and Fourteenth Amendments, the Equal Protection Clause of the Fourteenth Amendment, and under New York common law for intentional infliction of emotional distress. After the filing of the Complaint, the City transferred the responsibilities of the CWA to the newly-created Administration for Children's Services ("ACS"). On June 20, 1996, plaintiff Diane Lampert Stadler ("Stadler"), an employee of ACS, was granted permission to intervene pursuant to Rule 24(b), Fed.R.Civ.P.

Harman has moved for partial summary judgment, arguing that the media contacts policy is unconstitutional as a prior restraint of speech in violation of the First and Fourteenth Amendments. The City has cross-moved for partial summary judgment, arguing that the policy is constitutional.

## I. *Facts*

### A. *The City Child Welfare Agencies and the Media Contacts Policies*

On February 12, 1996, the City reorganized its child welfare agencies, and CWA's functions were transferred to the newly-created ACS. ACS performs all of the functions of the former CWA, as well as supervises the City's Office of Child Support Enforcement and its Head Start program. ACS's child welfare responsibilities are wide-ranging and include investigating possible child abuse and neglect, providing prevention services to maintain the welfare of children, and administering foster care and adoption programs. ACS has more than 6,500 employees, which includes approximately 900 caseworkers. There are thirteen field offices within the City. ACS has a substantial caseload. Every year ACS investigates approximately 50,000 reports of child abuse and neglect, provides protective services to around 27,000 families, and deals with approximately 45,000 foster care cases.

At issue in this case are the executive orders promulgated by the City which govern contacts between the media and employees of the City's child welfare agencies. The first incarnation of this policy was Executive Order 634 ("HRA 634"), which was issued on March 1, 1995. On March 18, 1996, ACS issued Executive Order 101 ("ACS 101"), which replaced HRA 634, and currently governs ACS employees, including Stadler. On July 12, 1996, HRA issued Executive Order 641 ("HRA 641"), which replaced HRA 634 within HRA, and thus currently governs HRA employees, including Harman. ACS 101 and HRA 641 contain essentially the same terms. ACS 101 provides, in pertinent part, that:

Given the importance of the functions performed by ACS, the legal mandates protecting the confidentiality of its clients, and the sensitivity of its activities, the operations of the Agency are particularly vulnerable to disruptions which might occur as the result of inappropriate dissemination of information concerning its policies and activities. Therefore, communications with the media must be coordinated to assure that the Agency is able to fulfill its mission effectively, and within the legally imposed requirements of confidentiality. For this purpose, the ACS Media Relations Office has been designated ACS's principal avenue of communication with the press.

*All contacts with the media*—whether such contacts are initiated by media representatives or by an agency employee— *regarding any policies or activities of the Agency must be referred to the ACS Media Relations Office before any information is conveyed by an employee* or before any commitments are made by an employee to convey information. *The ACS Media Relations Office will determine* the appropriate manner in which to handle media contacts regarding Agency policies or activities, including *the appropriate person or persons to make such contacts, consistent with the efficient and effective opera-*

*tion of the Agency and the achievement of its objectives.*

Referrals of all potential media contacts and inquires and requests for information received by employees should be made to [the Public Information Officer].... Such referrals should identify the potential media contact or the source of a request or inquiry by name, phone number, and media affiliation and describe the nature of the contact and the desired information relating to the Agency.

*No employee may divulge to the media any information regarding any Agency policy or activity which is confidential* pursuant to the Social Services Law, or any other law.

No employee, except an employee designated to do so by the Agency, may hold himself or herself out to the media as expressing the views of the Agency.

(Emphasis added).

Also on March 18, 1996, Nicholas Scoppetta, the Commissioner of ACS, distributed a memorandum to all employees, including Harman. The memorandum instructed employees that pursuant to ACS 101, "[a]ll referrals of all potential media contacts and inquiries and requests for information re-

ceived by employees should be made to [the public information officer]." Moreover, the memorandum stated that "[a]ll media requests for ACS documents ... must be in writing and addressed to the ACS Freedom of Information Law (FOIL) Officer...."

State law requires that certain information related to the children who are under the care of the agency be kept confidential. In its brief, the City cites two New York State statutes and one administrative regulation. Section 422 of the Social Services Law requires that reports of child abuse and all other information collected by the department concerning such reports including photographs remain confidential. N.Y.Soc.Serv. Law § 422(4)(A) (McKinney Supp.1996).[1] The regulations which implement this law impose on the commissioner of social services in each district the duty to insure the confidentiality of the information protected by law. N.Y.Comp.Codes R. & Regs. tit. 18, § 432.7 (1996).[2] Finally, Section 372 of the Social Services Law requires that foster care records and reports containing information which identifies the children in foster care and certain demographic information about the children for whom the agencies have responsibility remain confidential. N.Y.Soc. Serv. Law § 372(3).[3]

---

1. The statute states that:

 Reports made pursuant to [Title 6, Child Protective Services] as well as any other information obtained, reports written or photographs taken concerning such reports in the possession of the department, local departments, or the commission on quality of care for the mentally disabled, shall be confidential and shall only be made available to [specific classes of people, such as physicians, courts, and agency personnel, but not including the press or public].

 N.Y.Soc.Serv. Law § 422(4)(A). Section 413 of Title 6 requires certain officials, including school teachers, doctors, and police officers, to report cases of suspected child abuse or maltreatment. Section 414 makes clear that any person is permitted to report suspected child abuse. Section 415 delineates the reporting procedure. Section 422(12) makes it a class A misdemeanor for any person willfully to permit or encourage the release of any information contained in the state's central register to persons not entitled to such information.

 Although not discussed by the parties, a recent statute entitled Elisa's Law Child Protective Services Reform Act of 1996, which became effective on February 12, 1996, relaxes some of the

confidentiality provisions of the child welfare laws by allowing the disclosure of "information regarding the abuse or maltreatment of a child" where such disclosure is "in the best interests of the child" and one other factor is met. The factors include cases where the subject of the child abuse report has been charged with committing a crime related to a report of child abuse, or where the child named in the report has died. N.Y.Soc.Serv. Law § 422–a(1).

2. The regulations state that,

 [t]he commissioner of social services in each social services district shall insure that any reports made, as well as any other information obtained, reports written or photographs taken concerning such reports, be confidential and shall only be made available to those persons defined under title 6 of article 6 of the Social Services law....

 N.Y.Comp.Codes R. & Regs. tit. 18, § 432.7 (1996).

3. Section 372(1) requires certain institutions and agencies "charged with duties in relation to abandoned, delinquent, destitute, neglected or dependent children who shall receive, accept or

The City argues that its media contacts policy is necessary because maintaining coordinated agency contact with the press is essential to "the effective and efficient operation of the agency." The City also justifies its policy by pointing out that the state confidentiality laws cited above require that certain information not be disclosed to the public. In his affidavit submitted in support of the City's position, CWA Commissioner Scoppetta states that the press relations policy "is necessary to prevent breaches of confidentiality."

### B. Harman's Alleged Violation of the Media Contacts Policy

Harman has been employed by the City for twenty-eight years. Harman began her career in the HRA, and after five years moved within HRA to the CWA. She worked briefly for ACS after it replaced CWA, and has recently been transferred back to HRA. In November 1995, Harman agreed to be interviewed for ABC News's *World News Tonight* in connection with a report about the much-publicized death of a six-year-old girl, Elisa Izquierdo, who allegedly died from physical abuse by her mother.[4] On November 29, 1995, *World News Tonight* broadcast a report which did not identify Harman by name, but included footage of Harman stating (1) "[t]he workers who are considered the best workers are the ones who seem to be able to move cases out quickly"; and (2) "[t]here are lots of fatalities the press doesn't know anything about."

Six weeks later, on January 11, 1996, Anna Ellis ("Ellis"), deputy borough director of CWA, instructed Harman to report to CWA's central personnel office in Manhattan. That same day, Harman reported to the personnel office and was told that she was being suspended without pay for thirty days because of the statements she had made on *World News Tonight*. She was given a memoran-

dum to this effect. On January 22, 1996, the suspension was confirmed by a letter from Jean Matthews, Executive Deputy Administrator of the Office of Personnel Administration of HRA, which stated that Harman was suspended "pending the disposition of the disciplinary proceeding regarding the charges" against her. The letter also informed Harman that "[t]he charges will contain specification and you will be advised with respect to your right to submit a reply and to be represented by counsel." Finally, the letter instructed Harman to report to the Office of Personnel Services on February 13, 1996, after the expiration of the thirty day suspension, "for assignment."

Harman claims that she was told on January 11, 1996 that she was being suspended for violating state confidentiality laws and HRA policy, but that she was not informed of the specific HRA policy she was accused of violating until the City identified HRA 634 at a hearing before this Court on February 5, 1996.[5] On February 11, 1996, pursuant to a stipulation between the parties, Harman was retroactively reinstated to her position with full back pay and benefits, her records were cleared of any discussion of the disciplinary action, all pending charges were dropped, and the agency agreed to take no retaliatory action against her.

Harman argues that her statements on *World News Tonight* did not disrupt her workplace. Adrienne Kirkland, the child protective manager to whom Harman reported at the time of the incident, testified in her deposition that after Harman's appearance on television the unit continued to operate in its normal manner between November, when Harman appeared on *World News Tonight*, and January, when Harman was suspended. Ellis, who was Kirkland's supervisor, testified in her deposition that upon learning of Harman's appearance on television, she was concerned. She also testified that she no-

---

commit any child" to keep records containing specific information such as the child's name, sex, date and place of birth, names of parents, and religious faith. Section 372(3) provides that "[s]uch records maintained by the department or an authorized agency ... regarding such children are confidential...."

**4.** The City disputes that the death was a result of abuse.

**5.** The City contends that Harman was specifically told on January 11, 1996 that she was being suspended for a violation of HRA 634, but have not cited any evidence to support its contention.

ticed no difference in the nature and quality of Harman's work between her television appearance and suspension.[6]

In her affidavit, Harman claims that she would be able to contribute to the public debate about child welfare—which she argues is a public issue. She also contends that her desire to speak to the press about child welfare services is being chilled by the regulations at issue in this case. Harman states that she would speak out again, but is afraid that she will lose her job with the City.

Subsequent to the filing of this motion for partial summary judgment, both Harman and Stadler requested expedited consideration by this Court. In connection with this request, on September 27, 1996, Harman and Stadler filed affidavits which reiterated their desire to speak out on public issues relating to the furnishing of child welfare services by the City. Harman's affidavit stated that she had spoken with a reporter from the *New York Post* and had referred the reporter to Stadler because Stadler is still employed by ACS. Stadler's affidavit stated that she informed the ACS Ombudsman that she was interested in speaking with the press on child welfare issues, but was told that she was to have no contact with the press to discuss any matters relating to ACS. Thereafter, a reporter from the *New York Post* sent a letter to the ACS press secretary indicating that she wished to speak with Stadler about child welfare issues, and stating that she would not ask Stadler to violate any confidentiality rules. The request was apparently denied.

## II. *Discussion*

### A. *Summary Judgment Standard*

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. In making this judgment, the burden is on the moving party, and all facts must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When the moving party has asserted facts which demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P.; *accord Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994). Thus, in determining whether to grant summary judgment, this Court must (1) determine whether a genuine factual dispute exists based on evidence in the record; and (2) determine, based on the substantive law at issue, whether the fact in dispute is material.

### B. *The Executive Orders At Issue*

A threshold issue that this Court must address is which executive order is being challenged. HRA 634 was the executive order that applied to Harman at the time of her suspension. Subsequently, after the reorganization of the City's child welfare agencies, ACS promulgated ACS 101, which applied to both Harman and Stadler because they were both transferred to the newly-created ACS. Accordingly, at the time this motion was filed, both plaintiffs and defendants addressed their arguments to the constitutionality of ACS 101. After the filing of this motion, however, Harman was transferred back to HRA, thus becoming subject once again to HRA 634. HRA 634 has now been replaced with HRA 641, which is almost identical to ACS 101.[7] Therefore, currently

---

6. While the City does not concede that Harman's appearance on *World News Tonight* had no adverse impact on the operation of the agency, it does not offer any evidence that there was any disruption.

7. In the relevant passages, there are only two substantive differences between ACS 101 and HRA 641: First, ACS 101 contains additional language in a sentence contained in HRA 641. The ACS version states that "[a]ll contacts with the media regarding any policies or activities of the Agency—*whether such contacts are initiated by media representatives or by an Agency employee*—must be referred...." HRA 641 omits the italicized language. Second, HRA 641 has added a sentence to the paragraph regarding confidential information, which states that "[t]he law

Harman is subject to HRA 641, and Stadler is subject to ACS 101. Because these two executive orders are not materially different, and because HRA 634[8] no longer applies to either plaintiff, further briefing is unnecessary, and I will consider the constitutionality of both ACS 101 and HRA 641.

### C. Interpreting the Executive Orders

I must construe ACS 101 and HRA 641 in order properly to evaluate their constitutionality. The plaintiffs contend that the policies should be construed by this Court as giving the City unbridled discretion in deciding whether its employees may speak. Commissioner Scoppetta has submitted an affidavit in which he presents the City's construction of the executive orders. He states that ACS 101 requires all employees to

refer potential media contacts to the media relations office, thus providing the agency with the opportunity to consider the nature of the potential contact and the likely effect thereof on the effective and efficient operation of the agency before any information is conveyed to the media representative. If necessary, the agency can also impart any relevant information to the employee before contact is made with the press representative. Ultimately, the employee may be permitted to handle the contact or may be informed that such contact is regarded as disruptive of the operation of the agency.

The key provisions of the executive orders at issue here provide that "[a]ll contacts with the media regarding any policies or activities of the Agency" must be submitted to the media relations office prior to the communication being made. The media relations office will then "determine the appropriate manner in which to handle media contacts ... including the appropriate person or persons to make such contacts." This determination is to be made "consistent with the efficient and effective operation of the Agency and the achievement of its objectives."

■ In the context of a city ordinance, the Court should "presume any narrowing construction or practices to which the law is 'fairly susceptible.'" *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 770 n. 11, 108 S.Ct. 2138, 2151 n. 11, 100 L.Ed.2d 771 (1988) (citation omitted). For purposes of this motion for summary judgment, I will accept the City's interpretation of the executive orders. Accordingly, I will assume that if a potential contact is submitted to the media relations office, that office's actions will be governed by consideration for the effective and efficient operation of the agency, and that the employee may be allowed to pursue the proposed contact with the media if the agency believes that such conversations would not impede the agency's effective and efficient operation.

### D. The Pickering/NTEU Balancing Test

The Supreme Court has recently outlined the appropriate test for determining the constitutionality under the First Amendment of

requires that all information or records relating to agency clients be held in the strictest confidence." These differences are not significant enough to alter the analysis of the constitutionality of these policies.

**8.** HRA 634 stated in part that:

In all media activities involving HRA, employees will be held accountable for preserving the confidentiality of the agency and the clients it serves. The HRA Media Relations office serves as HRA's principal voice to the press and other news media. Given the high visibility of HRA and its activities, our dealings with the press must be coordinated to assure that the agency speaks with one voice.

All media inquiries and requests for interviews must be referred to the HRA Media Relations office....

Reporters, photographers, television crews and other representatives from the press may not visit HRA facilities without prior clearance from Media Relations. If a reporter simply arrives at an office, he or she should be asked to contact HRA's Media Relations office to arrange for an appointment, if appropriate. If a reporter calls an HRA office, that call should be referred to Media Relations before any information is conveyed and/or before any commitments are made. It is not appropriate to indicate willingness to speak with a reporter until the conversation is cleared through Media Relations. If necessary, however, Executive Deputy designated public affairs liaisons should speak with reporters who call, for the purpose of learning the nature of the inquiry. The matter must then be referred to Media Relations, which will follow up with relevant parties.

prospective government restrictions on employee speech. In *United States v. National Treasury Employees Union,* 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("*NTEU*"), the Court addressed a challenge by employees of the federal government to a provision of the Ethics in Government Act which prohibited employees from receiving honoraria for making speeches or writing articles. In *NTEU,* the Court adopted and modified a balancing test developed in *Pickering v. Board of Ed.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), a case in which a school teacher challenged his dismissal on First Amendment grounds, arguing that he was fired for publishing a letter in a newspaper that was critical of the school board. The Court in *NTEU* described the *Pickering* test as follows:

> In *Pickering* and a number of other cases we have recognized that Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large.... When *a court* is required to determine the validity of such a restraint, it must *"arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs* through its employees."

*NTEU,* 513 U.S. at ——, 115 S.Ct. at 1012 (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35) (emphasis added) (brackets in original). *See also Bernheim v. Litt,* 79 F.3d 318, 324 (2d Cir.1996).

Because *Pickering* involved "a post hoc analysis of one employee's speech and its impact on that employee's public responsibilities," the *NTEU* Court recognized that the *Pickering* test had to be modified for cases

involving a prospective "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *NTEU,* 513 U.S. at ——, 115 S.Ct. at 1013. The Court noted that the honoraria ban in *NTEU*

> burdens speech far more than our past applications of *Pickering* because the ban deters an enormous quantity of speech before it is uttered, based only on speculation that the speech might threaten the Government's interests.

*Id.* at —— n. 11, 115 S.Ct. at 1013 n. 11.

More importantly, the Court held that the government faces a greater burden when it attempts to restrict speech prospectively.

> [U]nlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens.... For these reasons, the Government's burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action.

*Id.* at ——, 115 S.Ct. at 1014. The Court in *NTEU* formulated the government's burden in justifying regulation of the future speech of its employees as follows:

> The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the Government.

*Id.* (quoting *Pickering,* 391 U.S. at 571, 88 S.Ct. at 1736).

▮▮▮ Plaintiffs have endeavored to frame their challenge as rooted in the Supreme Court's prior restraint line of cases. A prior restraint of speech by the government requires a strict review of the government's actions.[9] While the reasoning of the prior

---

9. For example, in *Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), the Court struck down an ordinance granting parade permits unless, in the city commission's judgment, " 'the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused.' " *Id.* at 149–50, 89 S.Ct. at 937. The Court held that the ordinance gave the commission "virtually unbridled and absolute power to prohibit" any parade. *Id.* at 150, 89 S.Ct. at 938. Accordingly, the Court struck down the ordinance as a prior re-

straint lacking "narrow, objective, and definite standards to guide the licensing authority." *Id.* at 151, 89 S.Ct. at 938. *See also City of Lakewood,* 486 U.S. at 763, 108 S.Ct. at 2147 (holding that "a law or policy permitting communication in a certain manner for some but not for others" which leaves the question "of who may speak and who may not ... to the unbridled discretion of a government official" imposes censorship and is unconstitutional); *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2802–

restraint cases informs the *Pickering/NTEU* balancing—*NTEU* itself cited the famous prior restraint case *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), in discussing the chilling effect of a prospective restriction on government employee speech, *see NTEU*, 513 U.S. at ——, 115 S.Ct. at 1014—the prior restraint cases are not controlling here. In cases such as this where the government is acting as employer rather than as sovereign, the government has more power to prohibit speech—even to an extent that would be unconstitutional if applied to the public at large. *See id.* at ——, 115 S.Ct. at 1012. *See also id.* at ——, 115 S.Ct. at 1022 (O'Connor, J., concurring in part and dissenting in part); *Waters v. Churchill*, 511 U.S. 661, ——, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994) (plurality); *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983); *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35. In *Waters* a plurality of the Court elaborated on the source of the government's additional power to regulate speech of its employees:

> [T]he extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. *When someone who is paid a salary* so that she will contribute to an agency's effective operation *begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.*

*Waters*, 511 U.S. at —— – ——, 114 S.Ct. at 1887–88 (emphasis added). *See also Weaver v. United States Info. Agency*, 87 F.3d 1429, 1443 (D.C.Cir.1996).

■ In sum, because this case, as in *NTEU*, involves a prospective curtailment of employee speech by the government, the applicable analytical framework is the *Pickering/NTEU* balancing test. As Justice O'Connor concluded in her *NTEU* concurrence,

[t]he time-tested *Pickering* balance, most recently applied in *Waters*, provides the governing framework for analysis of all manner of restrictions on speech by the government as employer.

*NTEU*, 513 U.S. at ——, 115 S.Ct. at 1020 (O'Connor, J., concurring in part and dissenting in part).

### E. Standing

The issue of plaintiffs' standing to bring this challenge need not detain me long. To begin with, the defendants do not challenge the plaintiffs' standing to bring their attack on the executive orders. Harman has already been suspended once for speaking to the press in violation of the agency's prior media contacts policy, and those same statements, if made today, would run afoul of the current policy. The City does not contend otherwise. Moreover, both plaintiffs have declared in their affidavits that, but for the chilling effect of their agencies' policies, they would be speaking today on issues of public concern regarding their agencies.

■ Although there are differences in the relationship between the plaintiffs here and those in *NTEU*, and their respective regulations, the differences are not sufficient to create an issue regarding Harman and Stadler's standing to challenge the executive orders. In *NTEU* the plaintiffs had not yet violated the Ethics In Government Act, which they were challenging. Rather, the *NTEU* plaintiffs stated in affidavits that "but for" the honoraria ban, they would receive honoraria for speaking or writing engagements. In addition, "[e]ach of the individual [*NTEU*] respondents allege[d] that he or she has in the past received compensation for writing or speaking on various topics in full compliance with earlier ethics regulations." *NTEU*, 513 U.S. at ——, 115 S.Ct. at 1010. Indeed, in *Weaver*, the D.C. Circuit noted that *NTEU* involved "a simple pre-enforcement attack on a regulation restricting employee speech" and stated that such a claim

03, 49 L.Ed.2d 683 (1976) (holding that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights"); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68–72, 83 S.Ct. 631, 638–

640, 9 L.Ed.2d 584 (1963) (disapproving of prior restraint in obscenity context where there was no judicial review and vague standards for the exercise of discretion).

is "final" and "ripe" and that the plaintiff had "standing to pursue" it. *Weaver*, 87 F.3d at 1434. I therefore find that Harman and Stader have standing to challenge ACS 101 and HRA 641.[10]

### F. Undertaking the Pickering/NTEU Balance

■ The *Pickering/NTEU* framework requires (1) a determination that the speech at issue involves matters of "public concern"; and (2) a showing by the Government that the interests of both "potential audiences" and "present and future employees" engaging in "present and future expression" are outweighed by the "necessary" impact of the speech on the Government's actual operation. *NTEU*, 513 U.S. at ——–——, 115 S.Ct. at 1013–14.

### 1. Public Concern

■ In *NTEU* the Court indicated that the *Pickering* balancing test is applicable "only when the employee spoke 'as a citizen upon matters of public concern' rather than 'as an employee upon matters only of personal interest.' " *Id.* at ——, 115 S.Ct. at 1013 (quoting *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690). In determining whether the speech addresses matters of public concern, a court should examine "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690–91. In cases such as this where the speech is restricted prospectively, the Court has looked to the speech in which the employees had engaged prior to the adoption of new regulations in determining

whether the subject matter was of public concern. *See NTEU*, 513 U.S. at ——, 115 S.Ct. at 1013.[11]

■ In this case, Harman publicly stated that (1) "[t]he workers who are considered the best workers are the ones who seem to be able to move cases out quickly"; and (2) "[t]here are lots of fatalities the press doesn't know anything about." These statements, involving the management and track record of the City's child welfare agency, clearly bear on matters of public concern, and the City's brief does not contend otherwise.[12] Moreover, the plaintiffs have recently been contacted by the press and, but for the executive orders at issue here, would have spoken of issues which they believe are of "vital concern to the public." Consequently, I find that the *Pickering/NTEU* "public concern" requirement is met here.

### 2. The Interests of Harman, Stadler, and the Public

■ Harman and Stadler, as citizens, have not relinquished their rights to comment on matters of public interest merely because they are government employees. *NTEU*, 513 U.S. at ——, 115 S.Ct. at 1012. While the government does have additional power to proscribe employee speech,

> [v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.

**10.** There is one final threshold issue which I must address. Plaintiffs have brought a facial challenge to the constitutionality of the two executive orders. Ordinarily a facial challenge requires a plaintiff to show that the challenged regulation can never be constitutionally applied, which plaintiffs wisely concede they cannot prove, or that it is so overbroad that there is a realistic danger that the statute will significantly chill protected speech of third parties. *See, e.g., New York State Club Ass'n v. New York City*, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988). Because I have determined that the *Pickering/NTEU* balancing test must be applied here, however, it is unnecessary to judge the executive orders against the framework which otherwise governs facial challenges. Instead, the *Pickering/NTEU* test, which itself requires a court

to consider the "spectrum of speech suppressed," is the appropriate measure of constitutionality. *See Sanjour v. E.P.A.*, 56 F.3d 85, 92 & n. 10 (D.C.Cir.1995) (en banc) (explaining that the facial/as-applied distinction is unimportant in the *Pickering/NTEU* context).

**11.** One court has defined public concern speech broadly "to include almost any matter other than speech that relates to internal power struggles within the workplace." *Tucker v. State of California Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir.1996).

**12.** In its Rule 3(g) Statement, the City argues that this is an issue of law rather than fact, and disputes that Harman's statements were on matters of "great" public concern.

*Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987).

 In considering the public's interest as a potential audience, the Court must keep in mind that "[g]overnment employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions." *Waters*, 511 U.S. at ——, 114 S.Ct. at 1887. *See also Sanjour*, 56 F.3d at 94. *Pickering* itself confronted this issue. *Pickering* involved a teacher's published complaints about the school board's allocation of school funds. The Court noted that

> [o]n such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

*Pickering*, 391 U.S. at 571–72, 88 S.Ct. at 1736.

Here, there is an on-going public debate regarding the effectiveness of the City's child welfare agency.[13] Both Harman and Stadler, as employees of the City who have considerable experience as child welfare case workers, could lend valuable insight to the public debate surrounding the agency. In their affidavits, Harman and Stadler have indicated their desire to contribute to this debate. Unquestionably, Harman's comments regarding the deaths of children the agency has responsibility to protect, and the agency's priorities in supervising its case workers are matters

of considerable concern to the public. Consequently, Harman, Stadler, and the public at large have a substantial interest in a public discussion of the workings of the City's child welfare agencies.[14]

The City contends that the executive orders do not impact the employees', including the plaintiffs', First Amendment interests since the regulations are merely a preclearance procedure and employees may be allowed to speak with the press if the agency determines that their proposed speech is consistent with the efficient and effective operation of the agency. The City emphasizes that, as a consequence, these executive orders do not constitute a direct ban on speech, unlike in *NTEU* where a federal statute banned receipt of honoraria by employees.

ACS 101 and HRA 641 are clearly restrictions on employee speech. First, the executive orders directly restrict speech rather than merely place a burden on it. Indeed, ACS 101 and HRA 641 are even more constitutionally suspect than the honoraria ban struck down in *NTEU*. This is because the executive orders restrict speech itself—it is prohibited without prior approval—rather than burdening speech by preventing employees from receiving compensation for speaking.

Second, ACS 101 and HRA 641 violate the principles established in the Supreme Court's prior restraint line of cases. A prior restraint like that contained in these press policies "chills potential speech before it happens." *NTEU*, 513 U.S. at ——, 115 S.Ct. at 1014 (citing *Near*, 283 U.S. at 697, 51 S.Ct. at 625).[15] Consequently, lower courts, following *NTEU* and applying *Pickering*, have drawn

---

**13.** For at least the last year, the agency has been frequently in the news. *See, e.g.,* Joyce Purnick, Elisa's Death—A Year Later, Hints of Hope, *N.Y. Times*, Nov. 21, 1996, at B1; David M. Herszenhorn, City Promises to Explain Abuse Deaths, *N.Y. Times*, Sept. 30, 1996, at B3; Joe Sexton, Child Welfare Chief Provides a Glimpse at Decentralization, *N.Y. Times*, Sept. 8, 1996, at 1; Matthew Purdy, Agency Had Noted Problems in Home Where Girl Starved, *N.Y. Times*, Sept. 3, 1996, at A1.

**14.** As the City correctly points out, however, this interest is not absolute. Given New York State law regarding the confidentiality of certain child welfare information, plaintiffs wisely concede

that the First Amendment does not entitle them to reveal confidential information.

**15.** Of course, when the government is regulating the speech of its employees, not all prospective regulations are unconstitutional. For example, the Supreme Court has twice upheld the Hatch Act, which prohibits federal employees from taking "any active part in political management or political campaigns." In *United Public Workers of Am. v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), the Court upheld the Act in part by interpreting it narrowly to mean that pure expression was allowed, as long as it was not directed at assisting a political party. *Id.* at 100, 67 S.Ct. at 569–70. *See also United States*

from the Supreme Court's prior restraint line of cases in striking down regulations similar to ACS 101 and HRA 641. *See, e.g., Sanjour,* 56 F.3d at 96–97 (invalidating EPA ethics regulation which prohibited government employees from receiving expense reimbursement for non-official speaking on the subjects of the employee's official duties unless the employee's participation was authorized as " 'within the mission of the agency' ").[16]

This case similarly presents a prior restraint in the *Pickering/NTEU* context of government employee speech. These executive orders are constitutionally problematic precisely because they permit agency officials to make the decision about what speech will impact the "efficient and effective" operation of the agency *before* the actual speech is uttered. This case is thus very different from the *post hoc Pickering* context where the speech has already occurred, and has already had its effect on the operation of the agency. In contrast, the danger presented by these regulations is in allowing City officials to determine prospectively—without the benefit of hindsight—what speech should be allowed.[17] As the Court noted in *NTEU,*

[d]eferring to the Government's speculation about the pernicious effects of thou-

*Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 578–81, 93 S.Ct. 2880, 2897–98, 37 L.Ed.2d 796 (1973) (applying *Pickering* balancing and upholding Hatch Act definition of "political activity" as sufficiently definite).

*Civil Service Comm'n* and *Mitchell* are distinguishable from this case because the Court interpreted the Hatch Act to proscribe only *conduct*—aiding a political party—that had an expressive component, whereas ACS 101 and HRA 641 prospectively restrict all expression. The significance of this distinction was recognized in *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2917–18, 37 L.Ed.2d 830 (1973), in which the Court noted that the importance of a facial overbreadth challenge "attenuates as the otherwise unprotected behavior ... moves from 'pure speech' toward conduct." *See also Biller v. U.S. Merit Sys.Prot.Bd.,* 863 F.2d 1079, 1089 (2d Cir. 1988) (noting, in upholding specific application of Hatch Act, that the "Act carefully distinguishes between partisan political activities and mere expressions of views"). Moreover, the Hatch Act cases are also distinguishable on their facts—the burden placed by the Hatch Act on the free speech interests of employees is much more narrow and is targeted to alleviate the proven problem of corruption, while ACS 101 and HRA 641, as discussed below, interfere with a much broader range of expression than the defendants have shown is reasonably necessary to protect the government's interests.

16. Some courts have explicitly invoked the Supreme Court's prior restraint line of cases to strike down prior approval mechanisms similar to the one at issue here. *See, e.g., Spain v. City of Mansfield,* 915 F.Supp. 919, 923–24 (N.D.Ohio 1996) (striking down regulation requiring prior approval before members of fire department could make public statements on department rules, policies, procedures, or practices as lacking narrow, objective, and definite standards); *Fire Fighters Ass'n v. Barry,* 742 F.Supp. 1182, 1194–96 (D.D.C.1990) (striking down regulation requiring prior approval for any interview of a firefighter for lack of precise and clear standards).

Other courts have applied the *Pickering/NTEU* balancing test to strike down prospective government regulations of employee speech. *See, e.g., Tucker,* 97 F.3d at 1210–17 (applying *Pickering/NTEU* and striking down department orders banning religious advocacy and the display of religious materials in the workplace); *Yniguez v. Arizonans For Official English,* 69 F.3d 920, 937–47 (9th Cir.1995) (en banc) (relying in part on *Pickering/NTEU* to strike down Arizona constitutional amendment which prohibited government employees from speaking languages other than English in performing their duties), *cert. granted,* — U.S. —, 116 S.Ct. 1316, 134 L.Ed.2d 469 (1996); *Castle v. Colonial School District,* 933 F.Supp. 458, 460–65 (E.D.Pa.1996) (applying *Pickering/NTEU* and striking down school district regulation prohibiting school employees from engaging in political activities on school property at any time); *Goodman v. City of Kansas City, Mo.,* 906 F.Supp. 537, 539, 542–44 (W.D.Mo.1995) (applying *Pickering/NTEU* and striking down municipal regulation which prohibited city "employees from using bumper stickers, buttons, and yard signs to express their opinions about candidates and issues in city elections" as not justified by the city's concerns about political corruption); *Wolf v. City of Aberdeen,* 758 F.Supp. 551, 555 (D.S.D.1991) (applying *Pickering* and striking down regulation requiring prior approval before city employees could speak while on duty or comment on department decisions, rules, or regulations).

17. It is for this reason—that ACS 101 and HRA 641 are prospective regulations of speech—that *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), is distinguishable. In *Arnett* a plurality of the Supreme Court upheld, under a First Amendment vagueness and overbreadth challenge, a statute that allowed termination of federal employees for "such cause as will promote the efficiency of the service." The plurality found the regulation sufficiently definite. *Id.* at 162, 94 S.Ct. at 1648. Because the regulation at issue in *Arnett* was a mechanism for punishment *after* speech has taken place rather than a prior approval mechanism, *Arnett* did

sands of articles and speeches yet to be written or delivered would encroach unacceptably on the First Amendment's protections.

*NTEU,* 513 U.S. at —— n. 21, 115 S.Ct. at 1017 n. 21.

More specifically, preclearance procedures such as these present three related dangers.[18] First, they pose risks of "self-censorship by speakers in order to avoid being denied a license to speak." *City of Lakewood,* 486 U.S. at 759, 108 S.Ct. at 2145. Judge Wald addressed this very issue in her dissent in *Weaver,* a case involving a regulation requiring certain government employees to submit for pre-publication review speaking and writing materials relating to matters of "official concern," such as foreign policy. The regulation was construed by the majority such that it did not give the government the authority to prevent publication or to punish employees who publish material disapproved by the agency, thus making plaintiff's only injury a delay in publication. *Weaver,* 87 F.3d at 1440–41.[19] Accepting the majority's narrowing construction for purposes of this argument, Judge Wald noted that the regulation would nonetheless " 'induc[e] excessive caution in the speaker.' " *Id.* at 1444 (Wald, J., dissenting) (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n*

*on Human Relations,* 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973)).

The second First Amendment danger posed by this prior restraint mechanism is that it makes it more likely that an employee will be subject to sanctions after speaking. To illustrate this problem, consider the following situation. Assume that an employee goes to her superiors and, pursuant to these executive orders requests permission to speak with the press regarding her belief that the agency rewards too readily those case workers who move cases quickly rather than those who aggressively pursue allegations of abuse. Assume that her request is denied because the agency determines that such public discourse will injure the efficient and effective operation of the agency. Assume further that the employee speaks anyway, reasoning that, under a *Pickering* balancing, her right to utter this speech is protected by the First Amendment.

With these executive orders in place, there is a significantly greater likelihood that the employee will be fired or otherwise disciplined—despite the fact that her speech may very well be constitutionally protected. The agency will focus more carefully on speech to which an employee has already directed its attention and will be more inclined to discipline an employee who has disregarded its

not involve the same prior restraint concerns present here. In fact, the Court in *NTEU* also distinguished *Arnett* on the grounds that it did not involve a prospective restriction on speech, stating that "the *Arnett* plurality merely cited *Pickering* to support a general statute's *post hoc* application to a single employee's arguably unprotected speech." *NTEU,* 513 U.S. at —— n. 12, 115 S.Ct. at 1013 n. 12.

**18.** Although the City fails to cite these cases, the Supreme Court has allowed prior approval mechanisms for certain government employees. *See, e.g., Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (enforcing contract under which former CIA agent promised to submit book manuscript for prior review by CIA) (per curiam); *Brown v. Glines,* 444 U.S. 348, 354–55, 100 S.Ct. 594, 599–600, 62 L.Ed.2d 540 (1980) (upholding Air Force regulations requiring members to obtain approval from commanders before circulating petitions on bases in part because of the special requirements of the military and because the regulations "restrict[ed] speech no more than is reasonably necessary" to

protect military effectiveness); *Greer v. Spock,* 424 U.S. 828, 837–40, 96 S.Ct. 1211, 1217–19, 47 L.Ed.2d 505 (1976) (upholding Army base policy requiring prior approval of distribution of literature on the base by military personnel or civilians based in part on the special role of the military and on its holding that a military base is not a public forum). These cases are distinguishable from this case. *Snepp* dealt with national security matters and involved an agreement specifically allowing prior review to protect classified information—information Snepp clearly had no First Amendment interest in revealing. *Glines* and *Spock* focused on the special situation on military bases.

**19.** It is for this very reason that the *Weaver* majority decision is distinguishable from the facts of this case. While in *Weaver* the government did not have the power under the regulation at issue to prevent publication by the employee, here ACS 101 and HRA 641 do allow the agency to prevent employee speech, and thus present a greater burden on the First Amendment rights of employees.

orders. This example illustrates how the chilling effect operates here—employees faced with this system are much less likely to speak because the chances of being sanctioned are increased by the existence of the pre-screening mechanism. · Cf. *Weaver*, 87 F.3d at 1454 (Wald, J., dissenting).

The third danger present here is that by "permitting communication in a certain manner for some but not for others," these pre-clearance procedures raise "the specter of content and viewpoint censorship." *City of Lakewood*, 486 U.S. at 763, 108 S.Ct. at 2147.

■ ACS 101 and HRA 641 present all three of the above threats to First Amendment values. The executive orders at issue here induce excessive caution in the speaker by making clear that the speech must be approved in advance by the employee's superiors—this will tend to filter out any speech with which an employee suspects his or her superiors will disagree. Should any employee have the temerity to speak despite having been ordered not to do so, these executive orders substantially increase the likelihood that the agency will discipline that employee. Finally, these orders vest in the hands of the agency the decision about not only what to say, but who may say it. In sum, ACS 101 and HRA 641 clearly restrict the First Amendment rights of City employees. I turn now to the Government's articulated interests in order to assess whether they are significant enough to outweigh the interests of Harman, Stadler, and the public.

### 3. *The Government's Interests*

#### a. *Protecting the Efficient and Effective Operation of the Child Welfare Agencies*

■ The City has identified two primary interests which ACS 101 and HRA 641 are designed to protect.[20] The City's first justification for these executive orders is that they will ensure the efficient and effective operation of the agencies. Indeed, the executive orders incorporate this standard as the mea-

sure the Media Relations Office will use in determining how to handle media contacts. This language is talismanic, coming directly from the Supreme Court's *Pickering* jurisprudence. *See, e.g., Waters*, 511 U.S. at ——, 114 S.Ct. at 1888 (noting the importance of the "government's interest in achieving its goals as effectively and efficiently as possible") (plurality). In *Rankin*, the Supreme Court elaborated on the meaning of this phrase:

> We have previously recognized as pertinent considerations whether the statement *impairs discipline* by superiors *or harmony* among co-workers, has a *detrimental impact on close working relationships* for which personal loyalty and confidence are necessary, or *impedes* the *performance* of the speaker's duties or *interferes with the regular operation of the enterprise*....
>
> These considerations, and indeed the very nature of the balancing test, make apparent that the state interest element of the test focuses on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest.

*Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899 (emphasis added). Without doubt, the City has a significant interest in ensuring that employee speech does not disrupt the efficient and effective operations of its child welfare agencies. This is especially so given the breadth and importance of the mission of HRA and ACS. The question, however, is whether the City has adequately justified the screening of all media contacts on agency policies and activities by reference to this interest. The City's. use of the standard which the Supreme Court has endorsed in *post hoc* employee discipline cases as the standard for prospective screening of all speech is a creative, but ultimately untenable approach to this complex problem.

---

**20.** I note that in the *Pickering/NTEU* context, as in other First Amendment areas, the Court must "limit [its] inquiry to the 'interests the State itself asserts.'" *Sanjour*, 56 F.3d at 96 (quoting *Edenfield v. Fane*, 507 U.S. 761, 768, 113 S.Ct. 1792,

1798–99, 123 L.Ed.2d 543 (1993)). I particularly bear this rule in mind with respect to the City's confidentiality justifications—where the City cites only two statutes and a regulation in furtherance of its position.

First, the City has failed satisfactorily to show that employee speech poses a significant danger to the efficient and effective operation of the child welfare agencies. As the Supreme Court noted in *NTEU*,

> When *the Government* defends a regulation on speech as a means to ... prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured.... It *must demonstrate that the recited harms are real,* not merely conjectural, *and that the regulation will in fact alleviate these harms in a direct and material way.*

*NTEU*, 513 U.S. at ——, 115 S.Ct. at 1017 (quoting *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, ——, 114 S.Ct. 2445, 2450, 129 L.Ed.2d 497 (1994)) (internal quotation marks omitted) (emphasis added). The Court went on to state that

> As Justice Brandeis reminded us, a "reasonable" burden on expression requires a justification far stronger than mere speculation about serious harms. "Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women.... To justify suppression of free speech *there must be reasonable ground to fear that serious evil will result if free speech is practiced.*"

*NTEU*, 513 U.S. at ——, 115 S.Ct. at 1017 (quoting *Whitney v. California*, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J. concurring)) (emphasis added). Of course, the Court does give a degree of deference to government predictions of disruptions. In *Waters*, the Court noted that

> [W]e have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large.

511 U.S. at ——, 114 S.Ct. at 1887.[21] The City has not proffered any evidence that there has been a history of employee statements disruptive of the efficient and effective operation of the agency. Therefore, the City has failed to show that the harms it posits are real rather than conjectural.

Second, the City has failed to show that this preclearance procedure is reasonably necessary to ensure the efficient and effective operation of the agencies; in short, the executive orders are overinclusive. To begin with, this preclearance procedure is overinclusive because it requires employees to submit for review all contacts with the press regarding agency policies or activities, not just those that will interfere with the efficient and effective operation of the agency. In addition, the City does not propose through these regulations merely to advise employees that the agency believes that the proposed speech will interfere with the efficient and effective operation of the agency and that the employee runs the risk of incurring a disciplinary action should the employee proceed to speak. Rather, as the plain meaning of the regulations suggests, and as the City interprets these regulations, the employee will be forbidden from speaking at all should the agency decide that the speech interferes with its efficient and effective operation. Application of this standard alone, without reference to the other side of the *Pickering/NTEU* balancing test—the interests of the employees and the public in the speech—is simply too restrictive. Accordingly, even under the reading of ACS 101 and HRA 641 advanced by the City, the executive orders do not limit only that speech that is constitutionally proscribable under the Supreme Court's jurisprudence. In some cases, speech that the agency contends is disruptive of its efficient and effective operation will nonetheless be constitutionally protected after the balancing is done.

▆ In sum, ACS 101 and HRA 641 burden speech at two separate points: the point at which the employee must obtain prior approval for any speech related to the agency's policies, and the point at which the Government prohibits speech it determines will interfere with the efficient and effective oper-

---

21. *Waters* involved *post hoc* review of a government decision rather than, as in *NTEU* as well as here, a prospective burden on a wide range of potential speech. Thus, in *Waters* the government was determining harm after the speech had already occurred. Here, the City proposes to attempt to predict harm *before* the employee is allowed to speak.

ation of the agency. At each point, these executive orders are overinclusive.

Finally, wholly apart from the overinclusiveness of the executive orders, it is not obvious that the regulations even further the efficient and effective operation of the agency. Indeed, a strong case can be made for the reverse—that is, that public comment will increase scrutiny of the agencies and hasten improvements in their operations. To the extent that these executive orders chill speech, they deny an outlet for speech which might otherwise be a catalyst for reform, for increased spending, for closer attention from City Hall, for greater diligence by employees and supervisors, and for more frequent cooperation between residents of the City and the agencies. These are the very values the First Amendment is designed to secure.

In any event, the City can protect the efficiency of its operations without such a sweeping prohibition on speech. Here, the City has available to it a much more effective remedy for employees whose speech interferes with the agencies' efficient and effective operation—it can fire disruptive employees, subject only to the *post hoc Pickering* balancing review.[22] This solution has the virtue of allowing the City to avoid the constitutional difficulties which arise from a prior restraint. As the Supreme Court said in *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 1246–47, 43 L.Ed.2d 448 (1975),

> a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

(Emphasis in original). When a regulation will inevitably restrict more speech than is reasonably necessary to protect legitimate government interests, punishment after the fact is preferable unless the harm is grave and irreparable. *Weaver,* 87 F.3d at 1453 (Wald, J., dissenting). I turn now to the second justification proffered by the City to determine if such a grave and irreparable harm is present here.

### b. *Protecting the Confidentiality of Child Welfare Information*

■ Absent the "efficient and effective" justification, the City's only remaining interest is in the confidentiality of child welfare information. This is unquestionably a significant governmental interest. As the Court in *Pickering* recognized,

> [i]t is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal.

*Pickering,* 391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3. As with the City's efficient and effective justification, however, this confidentiality rationale fails adequately to justify the sweeping restriction on speech presented by these executive orders.

First, the City has failed to show that the danger posed to confidential information by employee speech is a real harm. The City has not offered any evidence—other than conclusory statements—suggesting that allowing ACS and HRA employees to speak to the press will lead to the revelation of confidential information, or that this speculative harm has occurred or is likely to occur in the absence of the executive orders. The predecessor to ACS 101 and HRA 641, both of which were promulgated this year, is HRA 634, which was issued on March 1, 1995. The City has not produced any evidence that HRA 634 was issued as a result of employees' statements to the press that revealed confidential information. Simply put, the City has failed to show that the recited

---

22. Of course, the executive orders can be said to be of assistance to employees, eliminating the risk of this loss of employment by the adoption of a bright line test requiring any discussion of agency policies or activities to be screened. Even in the absence of the executive orders, however, any employee who believes he or she is running the risk of crossing the line from protected to unprotected speech may avail him or herself of the opportunity to submit any comments to the agency's press office for review. *Simply put, the First Amendment vests the initial decision about whether to speak with the speaker rather than with the Government.*

harms are real and not conjectural or speculative.

Second, the executive orders do not merely screen disclosure of confidential information.[23] Indeed, if they only required prior approval for the disclosure of confidential information, these plaintiffs would not have brought this suit. The plaintiffs themselves admit that state statutes forbid disclosure of confidential information and do not contend that they have any right to disclose such information. The executive orders here, however, address the issue of disclosure of confidential information and the screening of communications to the press separately, and it is the latter alone that the plaintiffs challenge.

The City contends that in order to protect fully the confidentiality of information covered by state statutes, it is necessary to prescreen all communications regarding "any policies or activities" of the agencies. According to the City, the screening requirement will assist it in avoiding any breaches of confidentiality. But again, the City has failed to offer any evidence that the sweeping prior restraint mechanism of ACS 101 and HRA 641 is reasonably necessary to further the protection of confidential information. The state statutes and regulations cited by the City require that reports of child abuse and information collected concerning such reports, as well as records and reports containing identifying and demographic information regarding children in foster care be kept confidential. These laws apply to information regarding specific children. ACS 101 and HRA 641, however, go much further—they cover *all* information relating to *any* policies or activities of the agency. In this respect ACS 101 and HRA 641 are overinclusive. *Cf. Sanjour,* 56 F.3d at 95 (noting an "obvious lack of 'fit' between the government's purported interest and the sweep of its restrictions"). These executive orders would prevent speech, such as that made by Harman in this case, that does not reveal confidential information. Indeed, the City

does not contend that Harman's statements revealed or tended to reveal confidential information—and yet the City would argue that her statements violate the current policy.

Finally, there are alternative means by which the City can protect confidential information without infringing plaintiffs' First Amendment rights. The City has failed to show why enforcement of state confidentiality laws, which include criminal penalties, is not sufficient to protect the confidentiality of records and information covered by those laws. Moreover, it has not been shown why the targeted restriction in the executive orders preventing employees from revealing confidential information to the press does not accomplish the goal articulated by the City without regulating all speech on agency policies and activities.

### 4. *Balancing the Interests*

▮▮▮ I conclude that ACS 101 and HRA 641 fail to survive when the City's justifications for them are weighed against the interests of present and future employees and their potential audiences. The executive orders pose a significant restriction on employee speech and deprive the public of important information on issues of public concern. The City has failed to show that allowing employees to speak to the press will endanger the efficient and effective operation of the agency or is likely to reveal confidential information. Moreover, ACS 101 and HRA 641 prohibit a much broader range of speech than is reasonably necessary to accomplish these goals. Therefore, under *Pickering/NTEU* balancing, I find that the free speech interests of ACS and HRA employees and the public at large outweigh the City's articulated interests. Accordingly, I find ACS 101 and HRA 641 unconstitutional insofar as they require prior approval of employee speech that is protected by the First Amendment.

---

23. The executive orders, in a paragraph addressed solely to confidential information, remind employees that "[n]o employee may divulge to the media any information regarding any Agency policy or activity which is confidential pursuant to ... law." In an earlier paragraph the executive orders require employees to refer to the Media Relations Office all contacts with the media about "any policies or activities of the Agency."

### G. *Severance*

 Now that I have determined that ACS 101 and HRA 641 are unconstitutional, I must determine if the provisions of the executive orders that are unconstitutional are severable from the valid provisions. Whether this can be done is a question of state law. *Gary D. Peake Excavating Inc. v. Town Board of Hancock,* 93 F.3d 68, 72 (2d Cir. 1996). Under New York law, it is incumbent upon a court to refrain from invalidating those portions of a statute which are not objectionable. *Id.* In determining whether severance is appropriate,

> "The question is in every case whether the legislature, if partial invalidity has been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether. The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch instead of at the roots."

*Id.* at 73 (quoting *People ex rel. Alpha Portland Cement Co. v. Knapp,* 230 N.Y. 48, 60, 129 N.E. 202 (1920)).

Here, ACS 101 and HRA 641 are only unconstitutional to the extent that they require prior approval before City employees discuss with the media any agency policy or activity. The provisions of the executive orders which prevent the release of information that is confidential under New York State law, as well as the provision stating that employees may not hold themselves out to the media as expressing the views of the agency, however, are constitutional. Because the provision relating to prior review of employee statements to the media regarding agency policies or activities is contained in a separate paragraph of ACS 101 and HRA 641, it is easily severable from the remainder of the executive orders, including the valid provisions regarding the release of confidential information and the restriction on who may express the views of the agency.

### III. *Conclusion*

There is no dispute about certain important facts in this case. To begin with, there is no doubt that the agencies charged with the protection of the City's children have an essential and serious task to perform. It is also clear that these agencies are required under State law to preserve the confidentiality of certain information and have the authority to forbid their employees from transgressing those laws. Furthermore, the agencies may discipline any employee whose speech interferes with the efficient and effective operation of the agency, although that right to discipline is constrained by an employee's right to comment upon matters of public concern, and the balance of those competing interests.

What is in contention here is the right of a City agency with such a critical and sensitive function to restrict prospectively its employees' contacts with the press, and through the press with the public, regarding any agency policy or activity. I find that the agencies' press policies, ACS 101 and HRA 641, run afoul of the First Amendment insofar as they require employees to refer all contacts with the media regarding any agency policies or activities to the Media Relations Office before any employee may speak and to refrain from speaking unless given permission by the agencies under the criteria described in the policies. Consequently, I grant the plaintiffs' motion for partial summary judgment and deny the City's motion for partial summary judgment.

SO ORDERED.